FILED
CLERK
9/30/2016
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JULIA ELLINGHAUS, MARY JANE
WHALEN, JOHN PATAKY, and DEBRA
RUBIN PATAKY, individually and on behalf
of all others similarly situated,

                Plaintiffs,

  -against-

EDUCATIONAL TESTING SERVICE and
THE COLLEGE BOARD,

                Defendants.
------------------------------------------------------------X

**OPINION AND ORDER**
15-cv-3442 (SJF)(AKT)

FEUERSTEIN, District Judge:

      Plaintiffs Julia Ellinghaus, Mary Jane Whalen, John Pataky, and Debra Rubin Pataky (collectively, "Plaintiffs") filed a consolidated amended class action complaint (Dkt. 28) ("Amended Complaint" or "AC") on behalf of themselves and a potential class of similarly situated individuals against defendants Educational Testing Service ("ETS") and The College Board ("CB") (ETS and CB together, "Defendants") asserting claims of breach of contract, negligence, unjust enrichment, negligent misrepresentation, and violation of New York General Business Law ("NYGBL") § 349 and consumer protection statutes of thirty-five (35) other states and the District of Columbia. Plaintiffs' claims arise from a printing error in the written instructions provided to examinees during the June 6, 2015 administration of the Scholastic Aptitude Test ("SAT") and the way that Defendants managed the error. Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on the ground that plaintiffs Mary Jane Whalen, John Pataky, and Debra Rubin Pataky, all parents of examinees, lack standing to sue in their individual capacities, and pursuant to Federal Rule of

Civil Procedure 12(b)(6). (Dkt. 34). For the following reasons, Defendants' motion to dismiss is granted in its entirety.

I. BACKGROUND [1]

A. The Parties

CB is a New York non-profit corporation whose stated corporate purpose is to "provide for the continuance and development of a program of tests and examinations," and whose membership includes more than 6,000 educational institutions. (AC ¶¶ 27-28). ETS, a New Jersey corporation, develops and administers the SAT on behalf of CB. (AC ¶¶ 24-26). Plaintiff Julia Ellinghaus was a New York high school student who took the SAT administered on June 6, 2015. (AC ¶¶ 17-19). Plaintiff Mary Jane Whalen is a New York resident and is the mother of Jennie Whalen, a New York high school student who took the SAT administered on June 6, 2015. (AC ¶¶ 20-22).[2] Plaintiffs John Pataky and Debra Rubin Pataky are Florida residents and parents of a high school student who took the June 6, 2015 SAT in Jacksonville, Florida. (AC ¶ 23).

B. Procedural History

On June 15, 2015, Ellinghaus commenced the present action in this District on behalf of herself and a putative class of similarly situated examinees. (Dkt. 1). On June 16, 2015, the Patakys commenced a similar action on behalf of themselves and a putative class of examinees' parents and examinees over the age of eighteen (18) in the United States District Court for the

---

[1] The facts set forth herein are derived from Plaintiffs' Amended Complaint, the allegations of which are accepted as true for present purposes, other relevant documents that are incorporated by reference or are otherwise integral to the allegations in the Amended Complaint, and facts of which the Court takes judicial notice. *See, e.g., DiFolco v. MSNBC Cable LLC*, 662 F.3d 104, 111 (2d Cir. 2010).

[2] Julia Ellinghaus and Jennie Whalen expected to graduate high school with the class of 2016 as of the filing of the Amended Complaint.

Middle District of Florida. (M.D. Fla. Case No. 15-cv-723). On June 22, 2015, Whalen commenced a similar action on behalf of herself and a putative class of examinees in the United States District Court for the District of New Jersey. (D.N.J. Case No. 15-cv-4210). The *Pataky* and *Whalen* cases were transferred to this District on July 16 and 20, respectively, and subsequently consolidated with the present case before this Court. (Dkt. 27). On August 4, 2015, Plaintiffs filed the Amended Complaint. (Dkt. 28).

C.  **Registering for and Taking the SAT**

The SAT is a ten (10)-part, four (4)-hour standardized test that is intended to measure ability in the areas of reading, writing, and math, and that is widely accepted and considered by U.S. colleges and universities in connection with admissions. (AC ¶ 2). Defendants have stated that "[s]tandardized admissions tests offer colleges and universities a fair and impartial way to compare students from different school situations." (AC ¶ 39). On its website, ETS stated that "[b]ecause our tests are reliable and valid, those who take, use and rely on our assessments can do so with confidence." (AC ¶ 40).

Students may register for the SAT online or by mail. (AC ¶ 34-36). The fee to take the June 6, 2015 SAT was $52.50. (*Id.* ¶ 13). Students who registered for the June 6, 2015 SAT did so subject to the terms contained in the 2014-15 version of the *Student Registration Guide for the SAT and the SAT Subject Tests* (the "Guide"). (AC ¶ 35; Declaration of Alan E. Schoenfeld, dated August 25, 2015 ("Schoenfeld Decl.") (Dkt. 36), Ex. A). At the conclusion of the SAT, examinees certified that they "agree[d] to the conditions set forth online … and in any paper registration materials…" (Schoenfeld Decl., Ex. B at 8). The Guide sets forth, *inter alia*, Defendants' policies concerning test security and fairness, receiving and sending test scores,

3

privacy / use of examinee information, grounds for score cancellation, and makeup testing. (*See* Guide at 30-31, 38, 41-45).

The Guide provides that "ETS reserves the right to ... decline to score any test[ ] and/or cancel any test scores when, in its judgment,... a testing irregularity occurs." (*Id.* at 42). "Testing irregularities refer to problems or irregular circumstances or events associated with the administration of a test," including "administrative errors," like "improper timing" or "defective materials." (*Id.* at 43). With respect to testing irregularities and makeup tests, the Guide provides:

> When testing irregularities occur, ETS may cancel an administration or individual registrations, decline to score the test, or cancel the test score. ETS may do so whether or not the affected students caused the testing irregularities, benefitted from them, or engaged in misconduct. ETS is solely responsible for determining whether testing irregularities have occurred, and its decisions are final. When it is appropriate to do so, ETS gives affected test-takers the opportunity to take the test again as soon as possible, without charge. These remedies are the sole remedies available to test-takers as a result of testing irregularities.
>
> ****
>
> The availability of makeup testing and the conditions under which test-takers are entitled to take a makeup test are at the sole discretion of the College Board.

(*Id.* at 43, 45).

The Guide also sets forth policies concerning sharing examinee information with third parties:

> Your scores will be made available to your high school. You will have the option to disclose your information for scholarship purposes, Student Search Service, score reporting to institutions other than your high school, and receiving communications from the College Board.

4

> The College Board may use scores and information you provide for research purposes and may share your scores and information with third parties that enable them to provide services to the College Board, or to conduct research consistent with the College Board's not-for-profit education-related mission… **Your name will never be sold to a commercial marketing firm or retailer of merchandise or services (such as test prep).**

(*Id.* at 41) (bold text in original).

### D. The Printing Error, Defendants' Response, and the Alleged Harm

Test booklets distributed during the June 6, 2015 SAT contained a printing error: they incorrectly indicated that examinees had twenty-five (25) minutes to complete section eight (8) or nine (9) of the test – the third of three (3) reading or math sections – rather than twenty (20) minutes, the time intended to complete the relevant sections. (AC ¶¶ 5-6). Some test proctors allowed twenty-five (25) minutes to complete the section, while others who recognized the error allowed only twenty (20) minutes. (AC ¶ 9).

In the days following the June 6 SAT, CB sent an email to affected examinees informing them of the printing error and posted a notice on its website stating, *inter alia*, that "the College Board and ETS did not score the two affected sections and are able to provide students with valid and reliable scores." (AC ¶¶ 8-9, fn. 2).[3] In the notification, CB represented that "a comprehensive review and statistical analysis" indicated, *inter alia*, that "the scores for the shorter test were shown to be sufficiently reliable" and that "the scored sections had the same distribution of content and skills as the full-length test and therefore is reflective of the overall content specifications." (AC ¶ 8, fn. 2). CB also represented that it had "consistently communicated with [its] higher education members since learning of the misprint in the June 6 SAT administration book [and that] [a]dmission directors from across the country have told us

---
[3] The CB website notification is available at https://lp.collegeboard.org/information-regarding-the-saturday-june-6-sat-administration (last updated June 25, 2015).

5

that they have full confidence in those scores and will view them just like scores from any other SAT administration." (*Id.*). In the same website notice, CB reported that it would allow June 6 examinees "who let us know that their testing experience was negatively impacted by the printing error" to take the October 2015 SAT (the next scheduled administration) without additional charge. (*Id.*). Plaintiffs allege that, "[b]efore June 15, 2015, Defendants had not offered any compensation to examinees of the June 6th Test." (AC ¶ 55).

Plaintiffs allege that the affected examinees' "SAT scores are not equivalent to scores of SATs administered before the June 6th Test and cannot be equivalent to SATs administered thereafter." (AC ¶ 11). While Plaintiffs do not allege that any college or university admissions offices have declined to accept or otherwise questioned the reliability of the June 6, 2015 SAT scores, they cite news articles from *The Palm Beach Post*, *Wall Street Journal*, and *TechTimes* that call the abbreviated test's reliability into question, and allege that "the June 6th Test examinees' scores will be '*the SAT with the asterisk*.' " (AC ¶¶ 60, 85-87) (emphasis in original). Plaintiffs allege that they have suffered "damages due to the unreliable test: including costs for tutoring; wages lost from the opportunity cost of attending the June 6th Test instead of their job; costs of travel and lodging; and other costs of services that depended on reliable, accurate, uniform and timely scores from Defendants." (AC ¶ 127). Plaintiffs also allege that "[b]ecause of Defendants' refusal to provide for an early retest and timely reliable scores, Plaintiffs ... suffered damages including costs of lost scholarships with the passing of early decision deadlines and lost opportunities in college athletics." (AC ¶ 129). Plaintiffs allege that Defendants' offer to affected examinees to take the October 2015 SAT without charge was deficient because "[t]he October date Defendants propose[d] for a retest conflict[ed] with the SAT Subject Test given that day," and "many examinees state[d] they [were] confused about the

procedure and timing to sign up for the test." (AC ¶¶ 62-65). Plaintiffs do not allege that any affected examinees took or intended to take a conflicting Subject Test in October 2015 or that they were unable to sign up for the October 2015 SAT.

### E. Defendants' Use of Examinee Data

Plaintiffs also allege that CB "wrongfully keeps and sells examinee personal data, including that of Plaintiffs," and that their "personal information, [including] testing performance, address, and 'descriptive information' is available to purchase for four years after the last test the examinee takes." (AC ¶¶ 69, 71). CB offers unlimited access to examinee information for $16,500 per year, or a "per record" rate of thirty-eight cents ($0.38) per examinee, and "[u]pon information and belief, Defendants have over [sic] 30,000 customers buying data in this one program for examinee personal data." (AC ¶¶ 73-74, 76). Defendants also sell examinee data through a product called "College Board Search," which Defendants describe as "an integrated enrollment solution comprising three services designed to help institutions find students, focus recruitment strategies and improve marketing ROI." (AC ¶ 81). Plaintiffs allege that "Defendants obtain, disclose, or use personal information … without knowledge or consent of Plaintiffs" and other examinees, and "reap huge, ill-gotten monetary gains from this dishonest and deceptive use of Plaintiffs['] [and other examinees'] personal information." (AC ¶¶ 209, 212).

## II. DISCUSSION

### A. Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b)(6), district courts "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotations

7

omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A] complaint is not required to have 'detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

### B. Standing to Sue

Article III, § 2, of the Constitution imposes the "bedrock requirement" that federal courts may only hear actual "cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Id.* (internal citations omitted). In order to satisfy the Article III standing requirement, "a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Id.* (internal citations omitted). "In general, a plaintiff lacks standing to assert the rights or interests of third parties…" *In re Dynegy, Inc.*, 770 F.3d 1064, 1068 (2d Cir. 2014) (internal citations omitted).

While a parent may sue on behalf of her minor child, she may not assert claims in her individual capacity where her complaint suggests that only her child's rights were violated. *See, e.g., HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-cv-5881, 2012 WL 4477552, at *19 (S.D.N.Y. Sept. 27, 2012) ("[A]lthough parents may sue on behalf of their minor child, they do not have standing to assert claims on their own behalf for a violation of their child's rights.") (internal citations omitted); *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y 2001) (parent "lacks standing to bring claims under § 1983 based upon a deprivation of her

daughter's constitutional rights") (internal citations omitted). Plaintiffs Mary Jane Whalen, John Pataky, and Debra Rubin Pataky are parents of SAT examinees, not examinees themselves. (*See* AC ¶¶ 20-23). The Amended Complaint alleges various injuries to the June 6, 2015 SAT *examinees* (*see, e.g.*, AC ¶¶ 44, 52, 54-56, 61-65, 74-75), yet Whalen and the Patakys purport to seek redress in their individual capacities alongside examinee-plaintiff Ellinghaus. (*See* AC ¶¶ 90, 99, 121, 136, 150, 175, 188, 202, 204, 214-15). Insofar as they seek individual relief for harm allegedly sustained only by their examinee children, plaintiffs Whalen and the Patakys claims are dismissed due to a lack of standing.

C.   **Breach of Contract**

The first theory of Plaintiffs' breach of contract claim is premised upon the June 6, 2015 SAT printing error itself. Plaintiffs allege that "[w]hen Plaintiffs … purchased exam services from Defendants, Plaintiffs … entered into contracts (explicit or implied) with Defendants pursuant to which Defendants agreed to perform certain exam-related services." (AC ¶ 102). Plaintiffs allege that their contracts with Defendants obliged Defendants to "provide, administer, and score the SAT exam in a *reliable* and *uniform* manner," and to administer the SAT "in accordance with *proper* practices such that the SAT examination process would not be disrupted by circumstances within the Defendants' control, and the resulting score would be *comparable* to prior and subsequent SAT scores." (AC ¶¶ 103, 105) (emphasis added). Plaintiffs further allege that "[t]he contract imposes a legal duty on Defendants to deliver a *correct, appropriate*, and *accurately administered and scaled* SAT test to the test takers and institutions the test takers designated in their SAT registration." (AC ¶ 106) (emphasis added).

Plaintiffs recognize that the terms of the Guide govern the parties' relationship. (*See* AC ¶¶ 35, 109; Pl. Opp. Mem. at 6-7). Defendants agree that the parties entered a contractual

9

relationship governed by the terms of the Guide. (*See* Def. Mem. at 3-5, 9-14). In order to state a viable breach of contract claim a plaintiff must at the very least identify a contractual provision that the defendant breached. *See, e.g., Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) ("a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue") (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001)). Contrary to Plaintiffs' assertion, the Guide does not state that Defendants were contractually obligated to provide a "reliable," "uniform," "proper," "correct," "appropriate," "comparable," and/or "accurately administered and scaled" SAT. Indeed, the Guide explicitly recognizes the possibility of "testing irregularities," including "administrative errors" like "improper timing" and "defective materials," and sets forth Defendants' options for dealing with such irregularities, including "declin[ing] to score the test, or cancel[ing] the test score." (Guide at 43). Providing SAT instructions with a typographical error did not breach the terms of the Guide. Plaintiffs cannot overcome this deficiency by referring to "implied" and/or "good faith" obligations (*See* AC ¶¶ 102-03, 107, 113, 119) that are not in accord with the express terms of the Guide. *See, e.g., Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005) ("The implied covenant [of good faith and fair dealing] can only impose an obligation consistent with other mutually agreed upon terms in the contract… It does not add to the contract a substantive provision not included by the parties.") (internal quotations and alterations omitted).

The second theory of Plaintiffs' breach of contract claim is focused upon Defendants' response to the printing error. By June 15, 2015 – nine (9) days after the June 6 SAT – Defendants had alerted examinees that they were going to (i) calculate examinees' SAT scores without regard to the two (2) affected test sections, and (ii) allow any examinee who believed

"their testing experience was negatively impacted by the printing error" to take the October 2015 SAT without payment of any further registration fees. (*See* AC ¶¶ 8-9, 55-59, 62-65). The Guide provides that, in the event of "testing irregularities," "ETS may … decline to score the test, or cancel the test scores," and "[w]hen it is appropriate to do so, ETS gives affected test-takers the opportunity to take the test again as soon as possible, without charge." (Guide at 43). "The availability of makeup testing and the conditions under which test-takers are entitled to take a makeup test are at the sole discretion of the College Board." (*Id.* at 45).

Plaintiffs allege that Defendants breached these provisions because they "have not offered to allow Plaintiffs … to retake the test 'as soon as possible,' but instead have offered to allow a retest only at the next scheduled examination," and because they "have not offered refunds to [putative class member-examinees] who do not wish to retest at the time offered by Defendants." (AC ¶ 111). The Guide does not make reference to refunds and provides that the enumerated remedies (*i.e.*, offering a retest without additional charge) "are the sole remedies available to test-takers as a result of testing irregularities," so Plaintiffs' refund argument is a nonstarter. Plaintiffs' argument that Defendants' offer of a complimentary re-test in October 2015 violated the Guide's "as soon as possible" language is also without merit. The Guide vests Defendants with "sole discretion" as to both the "the availability of makeup testing and the conditions under which test-takers are entitled to take a makeup test." (Guide at 45). "Where the contract contemplates the exercise of discretion," that discretion is tempered by an implied "promise not to act arbitrarily or irrationally in exercising that discretion." *Doe v. Nat'l Bd. of Podiatric Med. Examiners*, No. 03-cv-4034, 2005 WL 352137, at *5 (S.D.N.Y. Feb. 15, 2005) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995)). Plaintiffs do not and could not allege that Defendants' decision to allow affected examinees to take the next scheduled

11

SAT in October 2015 without additional charge was an arbitrary or irrational exercise of discretion.

In sum, Plaintiffs do not have a viable breach of contract claim as to either the printing error itself or Defendants' response to it. As the Amended Complaint's deficiencies are based upon the underlying facts (*i.e.*, the terms of the Guide and Defendants' actions in light of those terms), and not the manner in which Plaintiffs pled those facts, amendment of the Amended Complaint would be futile. Accordingly, Plaintiffs' breach of contract claim is dismissed with prejudice.

### D. Negligence

Plaintiffs allege that Defendants were negligent because they breached their duties to: "exercise reasonable care in providing SAT exam services to Plaintiffs"; "have procedures in place to detect and prevent the printing error that resulted in an unreliable exam for Plaintiffs"; and "timely disclose that Plaintiffs … were taking an unreliable exam due to the printing error and that the error might have caused unreliable scores and lost time." (AC ¶¶ 123-25). Both parties recognize that their relationship was contractual in nature and governed by the terms of the Guide. The theory of Plaintiffs' negligence claim is the same as Plaintiffs' breach of contract claim, *i.e.*, Defendants distributed SAT instructions containing a typo that they should have noticed and corrected, and subsequently mismanaged the situation, all to Plaintiffs' detriment.

"Under New York law, '[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.'" *Nielsen Media Research, Inc. v. Microsystems Software, Inc.*, No. 99-cv-10876, 2002 WL 31175223, at *7 (S.D.N.Y. Sept. 30, 2002) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y. 2d 382, 389 (N.Y. 1987)). Plaintiffs have not and could not allege

that Defendants violated any legal duties independent of their contractual duties. *See, e.g., Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008) ("courts have found that in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory") (internal citations omitted); *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 517 F. Supp. 2d 832, 842 (E.D. La. 2007) (negligence claim duplicative of contract claim where "the duties cited [by plaintiffs] are simply restatements of ETS's broad contractual duty to correctly score the [exam] … and to correctly report the test-takers' scores"). Plaintiffs' negligence claim is duplicative of their breach of contract claim, and is accordingly dismissed with prejudice.

### E. Unjust Enrichment

Plaintiffs allege that they paid for "timely, reliable, SAT scores usable in the college selection and admissions process," and that Defendants failed to provide such SAT scores yet kept the registration fees, and were therefore unjustly enriched. (*See* AC ¶¶ 138-48). As the existence of a valid and enforceable contract governing the same subject matter precludes an unjust enrichment claim, *see, e.g., Ellington Credit Fund*, 837 F. Supp. 2d at 202 (collecting cases), Plaintiffs assert their unjust enrichment claim in the alternative – "[i]f the trier of fact finds no enforceable contract exists between Defendants and Plaintiffs." (AC ¶ 146). However, as Plaintiffs recognize in their Amended Complaint (at ¶¶ 98-119) and opposition brief (at 6-8), Plaintiffs (or their children) and Defendants entered valid contractual relationships governed by the terms set forth in the Guide.

In an attempt to proceed on an unjust enrichment theory, Plaintiffs argue that "[t]here remain … questions as to whether a contract was formed between Plaintiffs and Defendants…,

13

including… whether it was one of adhesion and whether the examinees were infants under New York law without the capacity to contract." (Pl. Opp. Mem. at 9). The "questions" that Plaintiffs suggest remain do not render the contracts between Defendants and the SAT examinees invalid or otherwise save Plaintiffs' quasi-contract claim. While there may be some disparity in bargaining power between a high school student registering for the SAT and Defendants, such disparity alone does not render a contract void. *See, e.g., Dalton v. Educ. Testing Serv.*, 588 N.Y.S.2d 741, 746 (Sup. Ct. 1992) ("Standardized contracts are not … unenforceable merely because of the inequality of bargaining power of the parties, without additional proof of unconscionability or violation of public policy."), *aff'd*, 614 N.Y.S.2d 742 (2d Dep't 1994), *aff'd*, 87 N.Y.2d 384 (N.Y. 1995); *K.D. v. Educ. Testing Serv.*, 386 N.Y.S.2d 747, 752 (Sup. Ct. 1976) ("[W]hile plaintiff's description of the agreement herein as a contract of adhesion may be justified, his conclusion that it is therefore void, is not."); *In re Educ. Testing Serv.*, 517 F. Supp. 2d at 843 (test-taker plaintiffs held to terms of contract where they "have not identified any provision of their contract with ETS that is so oppressive as to warrant judicial intervention").

Plaintiffs' inquiry into "whether the examinees were infants under New York law without the capacity to contract" is irrelevant in these circumstances. Contracts entered by minors are *voidable* at the election of the minor, not *void*. *See, e.g., I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) (internal citations omitted). "Unlike a void contract, a voidable contract is an agreement that '[u]nless rescinded … imposes on the parties the same obligations as if it were not voidable.' " *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001) (quoting 1 Williston on Contracts § 1:20, at 50 (4th ed. 1990)). Plaintiffs have not made any attempt to rescind their (or their children's) contracts with Defendants, and are in fact seeking to enforce them. The contracts are thus valid and foreclose

Plaintiffs' attempt to proceed on an unjust enrichment theory. Accordingly, Plaintiffs' unjust enrichment claim is dismissed with prejudice.

F.  **Negligent Misrepresentation**

Plaintiffs allege that "Defendants hold themselves out to students as experts in the administration and scoring of examinations," that "Plaintiffs … do not have this extensive experience and sophistication," and that "Plaintiffs … justifiably relied on Defendants' misrepresentations of expertise in the administration and scoring of examinations, and the June 6th Test in particular, to the detriment of Plaintiffs…" (AC ¶¶ 152, 157, 162). "To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must show '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.' " *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (N.Y. 2007)).

As Plaintiffs failed to allege that Defendants violated any legal duties independent of their contractual duties in connection with their negligence claim (*see supra*), there is similarly no "privity-like relationship imposing a duty on the defendant to impart correct information," as required for a viable negligent misrepresentation claim. *See Avazpour Networking Serv., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 365 (E.D.N.Y. 2013) ("The court's holding regarding the lack of any extra-contractual duty [as to plaintiff's negligence claim] requires dismissal of Plaintiffs' … cause[ ] of action alleging … negligent misrepresentation.") (internal citations omitted). Plaintiffs have failed to support their assertions of a privity-like relationship between Defendants and the millions of students who register for the SAT each year with any legal support. Moreover, Plaintiffs have failed to identify which misrepresentations Defendants

15

made that Plaintiffs relied upon. Broad and nebulous assertions regarding "expertise" aside, Defendants made no guarantees that their SAT instructions would be free of error or that they would manage a printing error in some way other than they did. In fact, the Guide explicitly contemplates the possibility of "testing irregularities," cancelled test scores, and makeup tests offered at Defendants' discretion. Accordingly, Plaintiffs' negligent misrepresentation claim is dismissed with prejudice.

G. **NYGBL § 349**

NYGBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]," and provides a private right of action to any person injured by a violation of the law. *See* NYGBL § 349(a), (h); *see also Rodriguez v. It's Just Lunch, Int'l*, No. 07-cv-9227, 2010 WL 685009, at *7 (S.D.N.Y. Feb. 23, 2010). "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 455 (2d Cir. 2008) (internal quotations omitted), *rev'd on other grounds sub nom. Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010).

Plaintiffs allege that Defendants violated § 349 in two ways: (1) deceiving SAT examinees with false representations about "reliable scores"; and (2) deceiving SAT examinees with respect to the "collection, storage, amount, and use" of examinee information. (AC ¶¶ 204-14). Defendants do not dispute that the allegedly deceptive acts were directed at consumers. (*See* Def. Mem. at 23-25; Def. Reply Mem. at 17-20). However, both categories of Plaintiffs' § 349 claims fail because Plaintiffs have not adequately alleged that Defendants' representations

16

were "misleading in a material way" and/or that Plaintiffs sustained injuries as a result of the allegedly misleading behavior.

In the context of § 349, "misleading" means "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (N.Y. 1995)). With respect to the purportedly deceptive statements regarding "reliable scores," the Amended Complaint contains no allegations suggesting that such representations were misleading at the time Defendants made them to Plaintiffs (or their children) and other June 6, 2015 SAT examinees, *i.e.*, at the time of registration to take the June 6 SAT. Another federal court addressing § 349 claims against CB involving representations about the accuracy of SAT scoring dismissed such claims because "[t]he allegations made by Plaintiffs that [CB] led consumers to believe that the test would be scored accurately does not indicate any deception at the time such promise was made." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 999 (D. Minn. 2006); *see also id.* ("the 'act or practice' must surely have been deceptive at the time it was done and not merely wrong due to subsequent events"). This Court agrees with *Russo*; statements that were not "misleading" at the time they were made but were proven false by subsequent events are not actionable under § 349. Moreover, Plaintiffs fail to allege any injuries resulting from Defendants' purportedly deceptive claims of reliable SAT scores independent of the injuries Plaintiffs alleged in connection with their breach of contract claim. *See Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 304-05 (S.D.N.Y. 2012) (dismissing § 349 claim where plaintiffs "failed sufficiently to allege a 'loss … independent of the loss caused by the alleged breach of contract'") (quoting *Spagnola v. Chubb Corp.*, 574 F.3d

64, 74 (2d Cir. 2009)). Accordingly, Plaintiffs do not state a viable § 349 claim as it pertains to Defendants' statements concerning the reliability of SAT scores.

Plaintiffs also allege that Defendants violated § 349 by "obtain[ing], disclos[ing], or us[ing] personal information from this testing application and the testing results without knowledge or consent of Plaintiffs," and "reap[ing] huge, ill-gotten monetary gains from this dishonest and deceptive use of Plaintiffs['] … personal information." (AC ¶¶ 209, 212). In the Amended Complaint, Plaintiffs allege they were "harmed" by these practices, but do not specify how. (AC ¶ 213). In opposition to Defendants' motion, Plaintiffs explain that the harm was "the loss of the value of [personal information] sold by Defendants [which] could total in the several hundreds of millions of dollars in ill-gotten profits." (Pl. Opp. Mem. at 21).

Plaintiffs' assertion that Defendants collected and/or shared their SAT scores and personal information without their knowledge or consent is incorrect, as the Guide discloses that CB "may use scores and information you provide for research purposes and may share your scores and information with third parties to enable them to provide services to [CB], or to conduct research consistent with [CB's] not-for-profit education-related mission." (Guide at 41). Plaintiffs thus argue that the misrepresentation lies in the fact that "Defendants represent[ed] … that they will 'share' Plaintiffs' [personal information], [but] they actually *sell* that [personal information]." (Pl. Opp. Mem. at 20) (emphasis in original). However, whether Defendants share Plaintiffs' information with third parties for free or in exchange for money has no material impact on Plaintiffs. In a case involving a virtually identical claim against CB and the company that produces the American College Test ("ACT"), the Seventh Circuit held that the ACT-examinee plaintiffs were not harmed and thus lacked standing to sue because, *inter alia*, "[t]he fact that Defendants allegedly collected a fee from participating educational organizations and

did not disclose this sale did not make Plaintiffs worse off." *Silha v. ACT, Inc.*, 807 F.3d 169, 172 (7th Cir. 2015). Plaintiffs suffered no injury as a result of Defendants' collection and sale of their personal information, and thus do not have a viable § 349 claim. Accordingly, Plaintiffs' § 349 claim is dismissed with prejudice.

### H. Consumer Protection Statutes of Other Jurisdictions

Plaintiffs, "individually, and on behalf of all similarly situated residents of each of … 35 other states and the District of Columbia," allege that the same conduct that purportedly violates NYGBL § 349 (*i.e.*, telling consumers that SAT scores are reliable and collecting and selling examinee information) also violates the consumer fraud and/or deceptive trade practices statutes of those thirty-five (35) other states and the District of Columbia. (AC ¶¶ 174-202). Plaintiffs are from New York and Florida. (AC ¶¶ 17, 20, 23). Plaintiffs have not stated a viable NYGBL § 349 claim (*see supra*) and do not allege the violation of any Florida statutes. (*See* AC ¶ 188). Plaintiffs lack standing to assert claims under the consumer protection laws of any state (or District) other than New York or Florida, and despite Plaintiffs' decision to file this case as a putative class action, "at this preliminary stage of the litigation, the only relevant standing inquiry is that of the named plaintiffs." *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 49 (E.D.N.Y. 2014) (internal quotations omitted); *see also Simington v. Lease Fin. Grp., LLC*, 10-cv-6052, 2012 WL 651130, at *9 (S.D.N.Y. Feb. 28, 2012) ("Where plaintiffs themselves do not state a claim under their respective state's consumer statutes, … they do not have standing to bring claims under other state statutes – even where they are named plaintiffs in a purported class action.") (internal citations omitted). Accordingly, Plaintiffs' claims under the consumer protection statutes of jurisdictions other than New York are dismissed with prejudice.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is granted in its entirety. Insofar as plaintiffs Mary Jane Whalen, John Pataky, and Debra Rubin Pataky seek individual relief for alleged violations of their examinee children's rights, their claims are dismissed due to a lack of standing. The Amended Complaint is dismissed with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

<u>s/ Sandra J. Feuerstein</u>
Sandra J. Feuerstein
United States District Judge

Dated: September 30, 2016
      Central Islip, New York